# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
January 7, 2020 Session

## STATE OF TENNEESSEE v. URSHAWN ERIC MILLER

**Appeal from the Circuit Court for Madison County**
**No. 16-435   Donald H. Allen, Judge**

_____

### No. W2019-00197-CCA-R3-DD

_____

Defendant, Urshawn Eric Miller, was convicted by a Madison County jury of premeditated first degree murder, felony first degree murder, attempted especially aggravated robbery, attempted second degree murder, aggravated assault, employing a firearm during the commission of a dangerous felony, evading arrest, and resisting arrest. The trial court merged the felony murder conviction into the premeditated murder conviction and the aggravated assault conviction into the attempted second degree murder conviction. The jury sentenced Defendant to death for the first degree murder conviction. For the remaining convictions, the trial court imposed an effective sentence of thirty years, to be served concurrently with his death sentence. On appeal, Defendant raises the following issues, as renumbered and reorganized by this Court: (1) the evidence was insufficient to sustain his convictions; (2) the trial court erred in ruling on various challenges during jury selection; (3) the trial court erred in admitting a video of his prior aggravated robbery during the penalty phase; (4) the death penalty is unconstitutional; (5) the aggravating factors did not outweigh the mitigating factors beyond a reasonable doubt; and (6) the death penalty is disproportionate in this case. Having carefully reviewed the record before us, we affirm the judgments of the trial court. However, we remand the case to the trial court for the correction of a clerical error.

**Tenn. R. App. P. 3 Appeal as of right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

George Morton Googe, District Public Defender, and Gregory D. Gookin, Assistant Public Defender, for the appellant, Urshawn Eric Miller.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Shaun A. Brown and Al Earls, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural Background*

### I. Guilt Phase

On November 25, 2015, the night before Thanksgiving, the victim in this case, twenty-four-year-old Ahmad "Mike" Dhalai, was working the cash register at the Bull Market, located on the corner of Arlington Avenue and Hollywood in Jackson, Tennessee. Abdul "Eddie" Saleh, whose brother owned the Bull Market and who was a cousin of the victim, was also working that evening, along with Lawrence Austin and Mr. Saleh's fourteen-year-old son, Foad. Mr. Saleh was in the back of the store near the restrooms when he heard a "loud pop" followed by two more "pops." He yelled, "What's going on?" as he came toward the front of the store. Mr. Saleh saw the victim on the floor with blood around his head. Mr. Saleh also saw a person standing in front of the cash register by the victim's feet. Mr. Saleh described the person as being tall and wearing dark clothing with a hoodie, mask, and gloves. Mr. Saleh went back toward the office because he was scared. When the person left, Mr. Saleh went to the victim. He saw a hole in the victim's head and blood everywhere. Mr. Saleh tried to stop the bleeding with paper towels while he called 911. Mr. Saleh handed the store's gun to Mr. Austin in case the assailant came back before the police arrived.

Surveillance cameras from the Bull Market recorded the shooting from various angles. The videos were entered into evidence and played for the jury. In the videos, the victim can be seen behind the cash register assisting Timothy Sinclair, Sr., a customer, and then assisting a female customer. Mr. Austin can also be seen mopping the floors nearby. A person wearing black clothing, gray gloves, and a white face covering enters the store. The person puts one hand up toward Mr. Austin while pointing a gun in his other hand toward the victim. The person approaches the victim and says, "Drop that shit off or I'ma shoot you dead in the head." The person looks back toward Mr. Austin, then again says to the victim, "Drop that shit off." The victim flinches as the person fires a shot that narrowly misses the victim's head. The victim turns and starts to walk away as the person continues saying, "Drop that shit off. Quit playing." The person then shoots the victim in the back of the head. The victim immediately falls to the ground, dropping his phone. The person turns and fires one shot in the direction of Mr. Austin, who is backing away towards one of the coolers. The person then jumps over the counter and

briefly bangs on the cash register with his elbow. The person then jumps back over the counter and flees the store. The entire incident lasts less than twenty-five seconds.

Mr. Austin testified that he had been working at the Bull Market for more than ten years, primarily cleaning and restocking. On November 25, 2015, he was mopping the floor and getting ready for closing. When a man came in with something covering his face, Mr. Austin did not pay much attention to it because the weather was getting cool. Mr. Austin believed that the person was black because he could see part of the person's face around his eyes. Mr. Austin then heard a voice say, "Drop it off." Although he did not see a gun, Mr. Austin heard a gunshot. Mr. Austin kept mopping, trying not to attract attention to himself, while he moved toward a refrigerator for cover. He then saw the gun when the person pointed it at him and fired. Mr. Austin hid behind one of the refrigerators. When he looked out, he saw the person jumping over the counter and running out of the door. Mr. Austin ran after him but did not see which way he went. Mr. Austin then went back in the store, asked Mr. Saleh if the victim had been hit, and saw "all this blood and stuff."

Foad Saleh, who was sixteen at the time of trial, testified that around 11:00 p.m. on November 25, 2015, he was riding his bike around the parking lot of the Bull Market when he heard two or three gunshots. Foad saw a black man wearing a black hoodie and pants come out of the store. The man was wearing a white mask over his face. The man ran toward Arlington Avenue around the corner of the store and jumped over a small ledge. Foad went into the store, where he saw blood on the floor and was told that his uncle had been hurt. Foad provided a description of the suspect and his direction of travel to the police when they arrived.

Timothy Sinclair, Sr., testified that he regularly shopped at the Bull Market. On the night of November 25, 2015, he drove to the store in his burgundy Tahoe in order to purchase a bag of ice and some beverages. He had parked his vehicle by the front door. As Mr. Sinclair was placing his purchased items in the back of his vehicle, he saw a person coming around the side of the building. The person was a black male wearing dark-colored clothes, a hoodie, and something white across his face. Mr. Sinclair saw a gun in the person's hand as the person entered the store. When the person fired two shots inside of the store, Mr. Sinclair quickly backed his vehicle into the street trying to get away. The person then came out of the store and went around the side of the building in the same direction from which he had come. Mr. Sinclair pulled his vehicle back into the parking lot and called 911. The police arrived on the scene very quickly.

The first officer on the scene was Officer Kevin Livingston, who was less than a mile away when the call came in at 10:55 p.m. Officer Livingston arrived on the scene in less than two minutes. When he arrived, he saw "a bunch of people standing outside in the parking lot pointing, yelling . . . [I]t was kind of chaotic." Officer Livingston went

inside the store and saw a man kneeling behind the counter putting pressure on the victim's head. The victim, who had a "pretty massive exit wound" on the upper left side of his head, was not moving but was still making shallow "gurgling" sounds. Officer Livingston described that "[t]here was blood, brain matter on the floor around [the victim]." Officer Livingston checked for a pulse but could not find one.

Other officers also quickly arrived on the scene, including Lieutenant Shane Beaver, the shift commander for the patrol division. After securing the scene, Lieutenant Beaver obtained a description of the suspect and a direction of travel. Lieutenant Beaver testified that there were approximately twenty officers in the area because it was shift change, and he directed them to set up a perimeter. K9 Officer Jeremy Stines and his dog, a German Shepherd named Pax, began to track the suspect. The dog led officers toward an old bowling alley and a wooded area near Lion's Field. At the top of an incline, Pax led the officers to a shirt and a pair of pants. Pax then led them toward a wooded area near the outfield fence of the baseball field. Officer Stines heard some rustling in the bushes and gave a warning that he had a dog.

As Lieutenant Beaver crossed the baseball field, he spotted an individual "just inside the wood line" near the scoreboard and the outfield fence. This person turned out to be Defendant. Lieutenant Beaver "began to issue verbal challenges" to Defendant by saying "something to the effect of [']police, come out with your hands up[.']" Defendant responded, "[expletive] you. You're going to have to come in here and get me." Defendant had a shirt wrapped around his hand, and Lieutenant Beaver was concerned that he was concealing a weapon. Defendant was pacing back and forth in the wood line and shouting expletives. Lieutenant Beaver testified that Defendant said, "You might get me, but I'm going to take one of you mother [expletive] with me," and "you're going to have to kill me . . . I'm not giving up."

Defendant was boxed in by officers. Sergeant Brandon Moss, along with Officer Stines and Pax, got into position on the other side of the fence. They could hear the challenges being given by Lieutenant Beaver to Defendant. Defendant then climbed over the fence and came in their direction. Sergeant Moss shined a flashlight on Defendant and gave verbal commands to him. Defendant refused to show his hands. Officer Stines released Pax, who charged at Defendant and bit him on the shoulder. Both Defendant and the dog fell to the ground. Defendant had the dog around the neck in a chokehold and refused to let go. Officer Stines struck Defendant's head with his gun. Defendant let go of the dog but still refused to comply with commands to show his hands. Officer Kyle Hamilton used his Taser to subdue Defendant. Officer Hamilton was then able to handcuff Defendant and take him into custody. Video from Officer Hamilton's Taser was entered into evidence and played for the jury.

After Defendant was taken into custody, Sergeant Moss used his dog, Kyra, to search the area for additional evidence. Sergeant Moss located a cell phone, clothing, and a black .38 caliber revolver. The gun was found approximately ten to fifteen yards away and on the same side of the fence from where Defendant had been taken into custody. The cylinder of the revolver was opened, and it contained three unfired cartridges and three fired cartridges. Other officers on the scene also found a pair of gray gloves, a piece of white fabric made out of a t-shirt type of material, and a set of keys. Defendant stipulated that the cell phone found at the scene was registered to him.

Investigator Marvin Rodish, Jr., processed the crime scene at the Bull Market. He photographed a hole in one of the coolers and a hole and an indentation in the wall behind the counter. He found a projectile behind a package of cigarettes behind the counter. Another projectile went through the wall behind the counter into the back office and lodged in the sheet metal of a walk-in freezer. A third projectile was recovered from the ceiling above a cooler inside the store.

Investigator Daniel Long testified that he was involved in the search of Defendant's residence. One of the keys found in the woods opened a lock on the back door of the residence. The other key opened the door of a car parked on the street in front of the house, which was registered to Defendant at that address. Inside Defendant's bedroom, Investigator Long found a white t-shirt with a section cut out of it.

Dr. Thomas Deering, a forensic pathologist for Forensic Medical Management Services in Nashville, conducted the autopsy of the victim. The victim's cause of death was a gunshot wound to the head. The victim had an entrance wound on the right side of his head behind his ear. The bullet fractured the victim's skull and passed through his brain before exiting on the left side of the victim's forehead. The victim also had gunpowder stippling on his right hand and wrist and bruises on his knuckles. Dr. Deering was able to collect one of the larger bullet fragments that were still inside the victim's head. On cross-examination, Dr. Deering testified that because the bullet passed through both sides of the victim's brain, he "would expect that person to go immediately unconscious" and that the victim's death would have been quick.

Dr. Eric Warren, a former special agent with the Tennessee Bureau of Investigation ("TBI"), testified as an expert in firearms identification. The gun found at the scene was a RG .38 special caliber revolver. Dr. Warren test fired the gun, but the bullets recovered from the scene were too damaged to make a definitive match. However, Dr. Warren was able to determine that the bullets were .38 caliber and had matching class characteristics to the recovered revolver.

Special Agent Charly Castelbuono testified as an expert witness in serology and DNA analysis. She compared DNA samples from the victim and Defendant to items

recovered in this case. The piece of white fabric found in the woods had a blood stain that matched Defendant. The t-shirt found in the Defendant's bedroom had a mixture of DNA, with Defendant being the major contributor. Although the tests on the inside of the right glove were inconclusive, the inside of the left glove contained a mixture of DNA with Defendant being the major contributor. Both the hooded sweatshirt and the jeans found in the woods also contained a mixture of DNA with Defendant being the major contributor. Agent Castelbuono was able to obtain a partial DNA profile from swabs taken from the gun and determined that Defendant was the major contributor.

Special Agent Rielly Lewis Gray determined that the outside of both the gray gloves found in the woods were positive for gunshot residue. Special Agent Miranda Gaddes compared the piece of white fabric found in the woods to the cut t-shirt found in Defendant's bedroom. She determined that they possessed "matching characteristics along the fracture line to conclude that the piece of white fabric from the woods and the t-shirt from the subject's bedroom were joined at one time."

At the conclusion of the State's proof, Defendant made a motion for judgment of acquittal. The trial court determined that the State had not established premeditation with regard to the charge of attempted first degree murder of Lawrence Austin and reduced the charge to attempted second degree murder. Defendant chose not to testify or present any proof. After deliberation, the jury found Defendant guilty of premeditated first degree murder of Ahmad Dhalai, first degree felony murder of Ahmad Dhalai, attempted especially aggravated robbery of Ahmad Dhalai, attempted second degree murder of Lawrence Austin, aggravated assault of Lawrence Austin, employment of a firearm during the commission of a dangerous felony, resisting arrest, and evading arrest. The State moved to nolle prosequi the charge for possession of a handgun by a convicted felon, which was granted by the trial court.

## II. Penalty Phase

The State entered into evidence a certified copy of a judgment in Madison County case number 09-34, in which Defendant was convicted of aggravated robbery and sentenced to serve eight years at 30%. The State then called Captain Jeff Fitzgerald of the Madison County Sheriff's Department. Captain Fitzgerald testified that he investigated a robbery of the Riverside Express gas station and convenience store in 2008 when he was a lieutenant. Defendant turned himself in and voluntarily gave a statement concerning his involvement in the robbery.

Alison Deaton testified that she worked at the Riverside Express convenience store when it was robbed in 2008. The robbery occurred around 11:00 p.m., close to closing time. Three men with their faces covered came into the store holding guns. Defendant was identified as one of the men. Ms. Deaton testified that one of the men

said, "Bitch, give me all your money or I'm going to shoot you in the mother[expletive] face." A video recording of the robbery from one of the store's surveillance cameras was admitted into evidence. The video shows three masked men entering the store, pointing guns at Ms. Deaton, jumping over the counter, and taking money from the cash register.

Ali Dhalai testified as a representative for the victim's family because the victim's parents lived in New York and could not travel due to their health. Mr. Dhalai testified that the victim had seven brothers and sisters and was very close to his family. The victim worked at his family's store while he attended school at Jackson State Community College. The victim was studying radiology and wanted to go into the healthcare field. Mr. Dhalai described the victim as mild mannered and a "kind, caring, giving person." After the victim died, his family discovered that he gave money to several charities, including the Red Cross and some charities that worked overseas in Africa and the Middle East.

In mitigation, the defense called Dr. James Stanley Walker, a psychologist who was double board certified in clinical neuropsychology and forensic psychology. Dr. Walker testified that he evaluated Defendant and administered a comprehensive battery of psychological tests. Dr. Walker also reviewed information from several of Defendant's family members. Dr. Walker diagnosed Defendant with cognitive disorder, cannabis use disorder, post-traumatic stress disorder, and antisocial personality disorder.

Dr. Walker testified that Defendant had a "history of some intellectual limitations." At eight years old, Defendant's IQ was tested at 78, which was in the 7th percentile compared to the average child. Defendant dropped out of school in the 10th grade. When Dr. Walker tested Defendant's IQ in January 2017, he scored an 86, which was in the 18th percentile. Dr. Walker testified that Defendant's attention score was "in the range where we would expect a person who would be severely mentally retarded to be" and that his speed of mental processing was "quite limited." Defendant's work history, which included working in a warehouse and as a fast food cook, was "consistent with his limited cognitive skills" and never required much responsibility.

Defendant admitted that he was dependent on marijuana and had smoked an excessive amount for years. Several other family members also had chronic substance abuse problems and criminal histories. Defendant's mother smoked marijuana heavily while she was pregnant with Defendant. Defendant was abandoned by his biological father, and his mother had "a succession of boyfriends or husbands who persistently mistreated [Defendant] over the years." One told Defendant to pour rubbing alcohol on his penis so that he would scream with pain. Defendant's mother was not very loving and nurturing, calling Defendant names like "dumb" or "stupid." Defendant was often in the care of his grandmother, who was a chronic alcoholic and also mistreated him.

Dr. Walker testified that a genetic predisposition combined with childhood trauma led to Defendant's developing antisocial personality disorder. Dr. Walker described someone with antisocial personality disorder as "tend[ing] to be irresponsible . . . reckless, impulsive, deceptive." He testified that people with antisocial personality disorder "are constantly getting into trouble because they violate other people[']s rights. They don't obey the rules. They bend the rules. They break the rules when they have the opportunity."

Dr. Walker also found that Defendant's rough childhood, in addition to the fact that he was shot in the back as a teenager and spent seven years in prison, contributed to his developing post-traumatic stress disorder, or PTSD. Dr. Walker explained that Defendant did not have the classic presentation of PTSD that involves flashbacks and reliving traumatic experiences. Instead, Dr. Walker testified that Defendant's PTSD manifested as emotional numbing as well as being overly suspicious of others, ready to be mistreated or persecuted.

On cross-examination, Dr. Walker agreed that Defendant did not cooperate with an initial evaluation at Middle Tennessee Mental Health Institute and that he was diagnosed with malingering, which involves fabricating or exaggerating symptoms of mental illness. Dr. Walker agreed that Defendant sought out stressful situations, like participating in robberies, rather than avoiding them like someone with PTSD typically might do. Dr. Walker explained that Defendant did not go into a lot of details about his past traumas and that much of the information came from interviews with Defendant's family. Dr. Walker testified that at the time of this incident, Defendant had recently been kicked out of the house he had been living in because his uncle discovered marijuana in Defendant's room. Defendant also joined a gang when he was younger, which would be consistent with antisocial personality disorder. Dr. Walker explained that PTSD is not related to either participating in or avoiding criminal activity.

The defense also called Dr. Keith Caruso, a board certified forensic psychiatrist with special expertise in mitigation. Dr. Caruso evaluated Defendant, interviewed Defendant and several family members, and reviewed other reports and information. Dr. Caruso agreed that this was not a case where a mental disorder prevented Defendant from appreciating the wrongfulness of his conduct. Dr. Caruso agreed with Dr. Walker that Defendant fit the diagnosis for PTSD, cannabis use disorder, and antisocial personality disorder.

Dr. Caruso explained that Defendant had a disadvantaged childhood, being abused, neglected, and raised in poverty. Defendant had a genetic predisposition to antisocial personality disorder and substance abuse disorder. Defendant was abandoned by his biological father, who also had a criminal history. Defendant's mother smoked marijuana heavily during her pregnancy. Defendant's mother had been abused and had

eventually been placed in foster care, leading to what Dr. Caruso called a "generational lack of instruction and normal coping mechanisms in his family." Defendant and his family moved eight times before Defendant was ten years old, creating instability. Defendant was also exposed to violence in the community at a young age, which Dr. Caruso explained "models violence as problem solving." Defendant had a lower than average intelligence as well as ADHD as a child, which negatively impacted his performance in school.

Dr. Caruso, who had a lot of experience with PTSD as a former military psychiatrist, explained that a person can develop PTSD by being "exposed to actual or threatened death or serious bodily injury." Defendant was shot in the back when he was seventeen years old. Dr. Caruso explained that Defendant avoided talking about the shooting and acted distressed when he was asked questions about it. However, Defendant did mention having a flashback to the shooting when he was held at gunpoint a year later. Defendant also talked about having dreams where people were trying to hurt him. Dr. Caruso testified that Defendant saw the world as a threatening place and that he became distrustful and emotionally detached. Defendant coped by binge drinking and using marijuana. Defendant also dropped out of high school and began carrying a gun. Defendant's troubles with the legal system accelerated after he was shot. Defendant spent several years in prison and had only been out for a few months at the time of this incident. Dr. Caruso did not believe that Defendant was malingering, which he described as someone faking or exaggerating a condition for some kind of gain, like getting out of trouble. Dr. Caruso explained that Defendant did not try to draw attention to his condition or use terms that he did not really understand the way a person who was malingering might.

On cross-examination, Dr. Caruso testified that having PTSD did not prevent Defendant from being the aggressor but instead caused him to avoid being put in the position of the victim. Additionally, the numbing effect contributed to Defendant's committing crimes against other people. Dr. Caruso agreed that this was not a classic response to having PTSD. Dr. Caruso agreed that Defendant appreciated the wrongfulness of his conduct. Dr. Caruso agreed that Defendant made a plan to rob the Bull Market and that he made the choice to kill someone.

In rebuttal, the State called Dr. Kimberly Brown, an associate professor in clinical psychology and director of the Forensic Evaluation Team at Vanderbilt University. Dr. Brown evaluated Defendant, which included interviewing both Defendant and his mother, reviewing the records in this case, and reviewing the reports of the other experts. Dr. Brown agreed that Defendant had antisocial personality disorder, cannabis use disorder, and a history of ADHD. Dr. Brown did not agree that Defendant, whose IQ was 86, had borderline intellectual functioning, which applies to people with an IQ between

70 and 80. She explained that Defendant's IQ, although considered low-average compared to the general population, was "pretty typical for a criminal defendant."

Dr. Brown also did not agree that Defendant met the criteria to be diagnosed with PTSD. Dr. Brown acknowledged that Defendant had been "exposed to several traumas," some of which he reported to Dr. Brown that he had never told anyone else. Dr. Brown explained that not everyone who experiences traumatic events in their childhood develops PTSD. Although Defendant may have experienced flashbacks or nightmares in the past, he did not report that he was actively experiencing those types of symptoms. Additionally, one of the tests administered to Defendant by Dr. Walker, the Trauma Symptom Inventory, indicated that all of Defendant's skills were in the normal range, which was not consistent with someone who has PTSD. Rather than avoiding talking about his past, Dr. Brown found Defendant to be very open and cooperative. While he did minimize certain things, like the impact of his father not being in his life, Defendant readily talked about traumas in his life and provided details. Dr. Brown did not find Defendant to be emotionally numb and testified that he became tearful when talking about some of his past traumas. Dr. Brown testified that Defendant's paranoia and hypervigilance were typical of someone facing trial for capital murder. Dr. Brown also did not find Defendant to be emotionally distant or avoiding relationships, explaining that he had close relationships with his mother, aunts, and several close friends. Defendant even reported to Dr. Brown that the reason he lost his job a month before this incident was because he quit over how his boss was treating a coworker. After his uncle kicked him out for having marijuana, Defendant went back to living with his mother.

On cross-examination, Dr. Brown testified that she primarily focuses on forensic evaluations to determine competency to stand trial and insanity at the time of the offense and that capital sentencing issues make up a minority of her evaluations. Dr. Brown agreed that Defendant tended to minimize certain things, like the impact of his father's absence and the abuse to which his mother was exposed. Dr. Brown agreed that Defendant did not display any signs of malingering during her evaluation of him. Dr. Brown testified that Defendant was diagnosed with malingering when he was evaluated by Middle Tennessee Mental Health Institute (MTMHI) shortly after his arrest. Rather than just being silent or uncooperative, Defendant claimed that he was hearing voices and gave nonsensical answers to questions about his charges. Dr. Brown agreed that Defendant had some symptoms of PTSD but not enough for a diagnosis.

Dr. Brown agreed that Defendant had antisocial personality disorder. She explained that antisocial personality disorder has both a genetic component and an environmental component, such as exposure to violence and other disadvantages in childhood. Dr. Brown agreed that Defendant had a disadvantaged childhood and a significant family history of substance abuse. Dr. Brown testified that there is a

relationship between exposure to marijuana while in the womb and a person having ADHD and a low IQ.

Dr. Brown found some mitigating factors in Defendant's case, primarily "revolv[ing] around his exposure to disadvantage, neglect and trauma." Defendant had two stepfathers that were abusive to his mother, and one was also abusive toward Defendant. When Defendant was three years old, he was whipped by his stepfather, leaving marks on Defendant. Defendant's mother also struggled with her own issues. She often ridiculed Defendant and called him names.

Dr. Brown testified about four major traumas that Defendant experienced. When he was eight years old, Defendant witnessed two teenaged boys beating up a girl and saw her bleeding from the mouth. When he was twelve years old, Defendant's older brother got into a serious fight and had his head stomped. Defendant tried to protect his brother but was pushed away. His brother ended up in the hospital with his jaw wired shut. When Defendant was seventeen years old, he was shot in the back during an argument with a person who owed Defendant money. When he was eighteen years old, Defendant was held at gunpoint during an attempted robbery at his friend's house. Defendant reported to Dr. Brown that he was more scared by this incident than when he was actually shot because he could see the gun and had time to think about what could happen.

The trial court instructed the jury with regard to the statutory aggravating circumstances as follows:

> 1. Defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person.
>
> The State is relying upon the crime of aggravated robbery, the statutory elements of which involve the use of violence to the person.
>
> 2. The murder was knowingly committed, solicited, directed, or aided by Defendant while Defendant had a substantial role in committing or attempting to commit or was fleeing after having a substantial role in committing or attempting to commit any especially aggravated robbery.

The trial court then instructed the jury as follows with regard to mitigating circumstances:

> Tennessee law provides that in arriving at the punishment, the jury shall consider as previously indicated any mitigating circumstances raised by the evidence which shall -- which shall include, but are not limited to, the following:

1. There are choices other than sentence of death.

2. Life without parole means that Urshawn Miller will never be released from prison.

3. If Mr. Miller is sentenced to life without possibility of parole, he will die in prison.

4. Mr. Miller has a mother, two aunts, an uncle, a brother, a sister, and other close family members. Mr. Miller's execution would have a devastating lifetime impact on all of these family members.

5. If Mr. Miller is executed, his execution will not undo the harm suffered by Mr. Dhalai's family, but life without parole will provide Mr. Miller the time to reflect on Mr. Dhalai's death for the rest of his life.

6. Mr. Miller suffers from mental disorders due to circumstances beyond his control, including genetics, abuse, neglect, trauma, and other upbringing and environmental factors.

7. Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of Defendant's character or record or any aspect of the circumstances of the offense favorable to Defendant, which is supported by the evidence.

Defendant does not have the burden of proving a mitigating circumstance. There is no requirement of jury unanimity to any particular mitigating circumstance or that you agree on the same mitigating circumstance.

The jury found that both aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The jury imposed a sentence of death for both premeditated murder in Count 1 and felony murder in Count 2. The trial court merged Count 2 into Count 1. At a later sentencing hearing, the trial court imposed a sentence of twelve years for especially aggravated robbery, twelve years for attempted second degree murder, six years for aggravated assault, six years for employment of a firearm during the commission of a dangerous felony, six months for resisting arrest, and eleven months and twenty-nine days for evading arrest. The trial court merged the aggravated assault conviction into the attempted second degree murder conviction. The trial court ran the felony sentences consecutively to each other but concurrently with the death sentence and the misdemeanor sentences.

*Analysis*

## I. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). Because the jury's verdict replaces the presumption of innocence with one of guilt, the burden on appeal is shifted onto Defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Thus, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). Questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *Bland*, 958 S.W.2d at 659). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id*. The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

As relevant to this case, first degree murder is defined as either "[a] premeditated and intentional killing of another" or "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(1), (2). Especially aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," which is accomplished with a deadly weapon and the victim suffers serious bodily injury. T.C.A. §§ 39-13-401, -403. As charged to the jury, criminal attempt is defined as follows:

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: . . . .

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). Aggravated assault is defined as "[i]ntentionally or knowingly caus[ing] another person to reasonably fear imminent bodily injury" by "the use or display of a deadly weapon." T.C.A. §§ 39-13-101(a)(2); -102(a)(1)(A)(iii). It is an offense to employ a firearm during the commission of or attempt to commit a dangerous felony, including attempted second degree murder. T.C.A. § 39-17-1324(b), (i)(1)(B). Defendant does not challenge his convictions for resisting arrest or evading arrest.

*A. Identity*

Defendant challenges his convictions for first degree murder, attempted especially aggravated robbery, attempted second degree murder, aggravated assault, and employment of a firearm during the commission of a dangerous felony on the basis that the State did not adequately establish his identity as the perpetrator. "The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The State has the burden of proving the identity of Defendant as the perpetrator beyond a reasonable doubt. *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995). The identification of Defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Viewed in the light most favorable to the State, the evidence at trial established Defendant's identity as the masked assailant at the Bull Market. Although none of the eyewitnesses could identify Defendant, they were able to provide a description of the suspect and a direction of travel to the police, who responded to the scene within minutes of the shooting. Using a trained police dog, the officers were able to track the suspect to a nearby wooded area behind a baseball field. Defendant was seen hiding in some bushes in that wooded area, and he responded to the officers' commands to come out with death threats and profanity. After Defendant was taken into custody, the police found several items in the immediate vicinity that connected Defendant to the robbery at the Bull Market. The police found clothing that matched the clothing worn by the gunman, as described by the witnesses and seen in a video recording from the Bull Market's security

- 14 -

cameras. The police also found a .38 caliber revolver that was consistent with the fired projectiles recovered from the Bull Market. The revolver contained three spent shell casings, and the assailant fired his gun three times. The police found a pair of gloves that tested positive for gunshot residue. The police also found a piece of white cloth that was consistent with the white mask worn by the assailant and that was determined to have been cut from a t-shirt found in Defendant's bedroom. The clothing, gloves, revolver, and white cloth all contained Defendant's DNA. From this evidence, a rational trier of fact could conclude that Defendant's identity as the person who shot Mr. Dhalai and attempted to rob the Bull Market had been established beyond a reasonable doubt.

## B. Premeditated First Degree Murder

With regard to his conviction for premeditated first degree murder, Defendant contends that the State did not establish the element of premeditation beyond a reasonable doubt. As stated above, first degree murder is defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). Premeditation is defined as "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). "[T]he intent to kill must have been formed prior to the act itself," but it need not "pre-exist in the mind of the accused for any definite period of time." *Id*. Additionally, at the time the accused allegedly decided to kill, the accused must have been "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). Whether a killing was premeditated is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by Defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *Bland*, 958 S.W.2d at 660. This Court has also noted that the jury may infer premeditation from any planning activity by Defendant before the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

- 15 -

Shooting a retreating victim may also be circumstantial evidence of premeditation. *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

Viewed in the light most favorable to the State, the evidence at trial established that Defendant committed premeditated first degree murder. Defendant made preparations to conceal his identity prior to the killing by cutting a mask from a t-shirt. Defendant used a deadly weapon against an unarmed victim. Immediately prior to the shooting, Defendant threatened that he would "shoot [the victim] dead in the head" if the victim did not comply with Defendant's demands. Defendant fired one shot that narrowly missed the victim's head. The victim had turned away from Defendant when Defendant fatally shot the victim in the back of the head, just like he threatened that he would. Rather than rendering aid to the victim, Defendant fired another shot at the witness, Mr. Austin, before jumping over the counter and attempting to open the cash register. When he was unsuccessful, Defendant jumped back over the counter and fled the scene. Defendant attempted to conceal evidence of his involvement in the shooting by abandoning his revolver, his make-shift mask, and his incriminating clothing in the wooded area behind a baseball field, where he was apprehended by police. All of these circumstances support a finding by a rational trier of fact that Defendant premeditated the killing of Ahmad Dhalai.

## C. Felony Murder

With regard to his conviction for first degree felony murder, Defendant argues that the killing of the victim occurred prior to the attempted robbery and that "the connection between the demand for money and the killing is not close enough to support a conviction for" felony murder. As stated above, first degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). "In order for a killing to occur 'in the perpetration of' the felony, the killing must be 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Kiser*, 284 S.W.3d 227, 286 (Tenn. 2009) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (Tenn. 1956)). The only required mental state for felony murder is the intent to commit the underlying felony. T.C.A. § 39-13-202(b). The Tennessee Supreme Court has held that the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim," even if the actual killing occurs prior to the commission of the felony. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." *Id*. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that Defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id*. at 108.

Viewed in the light most favorable to the State, the evidence at trial established that Defendant had the intent to commit a robbery at the time he killed Ahmad Dhalai and that the killing was in pursuance of, not collateral to, the robbery. Defendant entered the Bull Market wearing a mask over his face and carrying a gun. As can be seen in the video from the Bull Market's security cameras, Defendant approached Mr. Dhalai, who was standing behind the cash register. With his gun drawn, Defendant said "Drop that [expletive] off or I'ma shoot you dead in the head." When Mr. Dhalai did not immediately comply with this demand, Defendant fired his gun at Mr. Dhalai's head twice, fatally wounding him. Defendant then jumped over the counter and attempted to open the cash register. The entire incident lasted only twenty-two seconds. From this evidence, a rational trier of fact could easily conclude that Defendant intended to commit a robbery and that he killed Ahmad Dhalai in the perpetration of that robbery.

## D. Attempted Second Degree Murder

Defendant argues that the evidence is not sufficient to sustain his conviction for attempted second degree murder of Lawrence Austin because the shooter did not make any threats toward Mr. Austin, only fired in Mr. Austin's direction one time, and did not attempt to chase Mr. Austin or shoot him again when the first shot missed. As stated above, second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). To support a conviction for attempted second degree murder, the State was required to prove that Defendant acted with the intent to knowingly kill another and took a substantial step toward doing so. *See* T.C.A. § 39-12-101. Second degree murder is a result-of-conduct offense. *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). In other words, "the State is not required to prove that Defendant wished to cause his victim's death but only that Defendant knew that his or her actions were reasonably certain to cause the victim's death." *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). Whether a defendant acts knowingly is a question of fact for the jury and may be inferred from the circumstances of the offense. *Id.* (citing *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000)).

Viewed in the light most favorable to the State, the evidence established that Defendant attempted to commit a knowing killing of Mr. Austin. The video from the Bull Market's security cameras showed that Defendant looked in Mr. Austin's direction prior to approaching the service counter and demanding money from Mr. Dhalai. After shooting Mr. Dhalai, Defendant turned and fired his gun once in the direction of the fleeing Mr. Austin. A rational juror could infer that Defendant was aware that this conduct was reasonably certain to kill Mr. Austin had his shot not missed. This Court has previously upheld a conviction for attempted second degree murder under similar circumstances. *State v. Abel Caberra Torres*, No. M2001-01412-CCA-R3-CD, 2003 WL

21349921, at *5 (Tenn. Crim. App. June 10, 2003) (holding that the evidence was sufficient to support a conviction for attempted second degree murder when Defendant fired a gun in the direction of the victim who was not the intended victim of an attempted robbery), *no perm. app. filed*. The evidence in this case is sufficient to sustain all of Defendant's convictions.

## II. Jury Selection

Defendant argues that the trial court erred during voir dire by either excusing or failing to excuse certain jurors for cause based on their views on the death penalty. Both the United States and Tennessee Constitutions guarantee a criminal defendant to the right to a trial by an impartial jury. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Both Defendant and the State have an interest in an impartial capital sentencing jury. *State v. Sexton*, 368 S.W.3d 371, 395 (Tenn. 2012) (citing *Uttecht v. Brown*, 551 U.S. 1, 9 (2007)). The trial court must balance these interests by eliminating potential jurors who would either automatically impose the death penalty or who, because of their personal scruples, would never impose the death penalty. *Id*. (citing *Morgan v. Illinois*, 504 U.S. 719, 734 n.7 (1992)). To that end, the "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *see State v. Reid*, 213 S.W.3d 792, 835-36 (Tenn. 2006). "[T]his standard . . . does not require that a juror's biases be proved with 'unmistakable clarity.'" *Id*. Instead, the trial court must have the "definite impression" that the prospective juror cannot follow the law. *State v. Hutchison*, 898 S.W.2d 161, 167 (Tenn. 1994) (citing *Wainwright*, 469 U.S. at 425-26).

The trial court's determination of whether a juror should be excused due to his or her views on the death penalty "shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that that determination was erroneous." *State v. Alley*, 776 S.W.2d 506, 518 (Tenn. 1989). "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht*, 551 U.S. at 9.

However, any error by the trial court in either excusing or failing to excuse a potential juror is harmless unless the jury who actually heard the case was not fair and impartial. *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993). "The failure to correctly excuse a juror for cause is grounds for reversal only if Defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him." *State v.*

*Schmeiderer*, 319 S.W.3d 607, 633 (Tenn. 2010) (citing *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990)). "A defendant must not only exhaust his peremptory challenges, but he must also challenge or offer to challenge any additional prospective juror in order to complain on appeal that the trial judge's error in refusing to excuse for cause rendered his jury not impartial." *State v. Irick*, 762 S.W.2d 121, 125 (Tenn. 1988).

Though not raised as an issue on appeal, we note that the trial court, the parties, and the jury questionnaire all repeatedly referred to the authorized statutory punishment of "imprisonment for life," Tennessee Code Annotated section 39-13-202(c)(3) as "life with parole." Arguably, there is no "parole" from a sentence of imprisonment for life. "The determinate sentence for a life sentence [imprisonment for life] is sixty years, as set forth in Tennessee Code Annotated section 40-35-501(h)(1)." *Brown v. Jordan*, 563 S.W.3d 196, 200 (Tenn. 2018). For first degree murder committed on or after July 1, 1995, as in the case *sub judice*, 100% of the sentence of sixty years must be served. It is axiomatic that when a defendant's sentence is fully served, that defendant must be released with no further restraint or supervision, unless otherwise statutorily authorized, as in certain sex crimes offenders who remain under community supervision for life, that begins "immediately upon the expiration of the term of imprisonment imposed upon the person by the court or upon the person's release from regular parole supervision, whichever first occurs." T.C.A. § 39-13-524(c). However, a person convicted of a murder which occurs on or after July 1, 1995, and who receives a sentence of imprisonment for life, can be granted certain statutorily authorized "sentence reduction credits" up to nine years. T.C.A. § 40-35-501(i)(1). Thus, if such an inmate obtains the maximum number of allowable sentence reduction credits, he will obtain credit for service of the entire sixty-year sentence after having been incarcerated for fifty-one years. *See* T.C.A. § 41-21-236 ("'sentence credits' includes any credit, whether called that or not, that results in a reduction of the amount of time an inmate must serve on the original sentence or sentences.") Thus, a person convicted after July 1, 1995, and who receives a sentence of imprisonment for life will never be on parole. When that person has actually served the determinate sentence of sixty years (comprising years actually incarcerated plus time credited by sentence reduction credits) he is released. "Life imprisonment without possibility of parole," Tennessee Code Annotated section 39-13-202(c)(2) is a statutory definition of a sentence created by the Tennessee General Assembly for the situation when a convicted defendant literally serves a sentence in the custody of the Tennessee Department of Correction, day for day, for the remainder of his life. Notwithstanding the use of this misnomer that there is a sentence of "life with parole," for purposes of clarity we will describe the proceedings in the trial court using the same misnomer used in the trial court.

In this case, the potential jurors completed questionnaires several weeks prior to trial that contained questions designed to elicit their views on the three possible

punishments for first degree murder: life, life without parole, and death. Most of the jury selection process was comprised of individual voir dire, wherein counsel for both parties as well as the trial court could ask the potential jurors more detailed questions. After each potential juror was questioned, the trial court would ask whether either party wished to challenge the juror for cause and would then rule accordingly. On appeal, Defendant argues that the trial court erred in denying his challenges for cause with respect to three potential jurors – Juror Robinson, Juror Little, and Juror Graves – forcing Defendant to use peremptory challenges to remove them. Additionally, Defendant argues that the trial court erred in granting the State's challenges for cause over Defendant's objection with respect to three potential jurors – Juror Eads, Juror Milhorn, and Juror Sesti. Finally, Defendant argues that the trial court erred in denying his challenge for cause with respect to Juror Crum after Defendant had exhausted all of his peremptory challenges, resulting in a jury that was not fair and impartial.

### A. Potential Jurors Not Removed For Cause

Prospective Juror Robinson wrote on his questionnaire that he did not believe that life without the possibility of parole was an appropriate punishment because of the cost of keeping someone imprisoned. In response to a question about that comment, Juror Robinson stated, "I believe in the Bible and I just think we need to go ahead with the death penalty in some cases like that." However, he also stated that he could fairly consider both life and life without parole as possible punishments and that the death penalty was "absolutely not" appropriate in all cases. In response to defense counsel's questions, Juror Robinson stated that he believed the death penalty was the appropriate punishment if the killing was premeditated and the person had "malice in their heart"; however, he would not consider a killing during a robbery of a store to be a premeditated act. Juror Robinson stated that in considering the appropriate punishment, he would take into account "the circumstances and the background of the person." Juror Robinson reiterated that he would listen to the proof, follow the law, and fairly consider all three punishments. The trial court found that Juror Robinson "would properly follow the law" and "would properly consider all sentencing options." Defendant has not established by convincing evidence that the trial court abused its discretion in not excusing Mr. Robinson for cause.

Potential Juror Little stated that she was familiar with the prosecutor because her brother worked for the District Attorney's Office as a child support investigator and her husband was a retired officer from the Jackson Police Department. This Court has held that the "relationship of jurors to people connected with law enforcement . . . does not give rise to an inherently prejudicial situation in and of itself." *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983). Juror Little stated that she may have a potential hardship with being sequestered due to her responsibility caring for her elderly mother but that she could "probably work it out if [she] had to." Juror Little also

informed the court that she was taking various prescribed pain medications. She stated that she might be uncomfortable with sitting for long periods of time but that her ability to concentrate would not be impeded. Whether a juror should be excused due to either health or hardship is also within the discretion of the trial court. *Cf. State v. H.R. Hester*, No. E2006-01904-CCA-R3-DD, 2009 WL 275760, at *19 (Tenn. Crim. App. Feb. 5, 2009), *aff'd and remanded*, 324 S.W.3d 1 (Tenn. 2010).

With regard to her views on the death penalty, Juror Little wrote on her questionnaire that she had "no problem with it" and that it could be the appropriate punishment in "some cases." Juror Little stated that she would fairly consider life without parole. On her questionnaire, Juror Little wrote that she believed there should be "no parole" for "taking life." However, in response to the State's question, she stated that "[i]t's possible" she would fairly consider life with parole depending on the circumstances of the offense and the background of Defendant. She reiterated that she would fairly consider all three forms of punishment. The trial court found that Juror Little's medications did not appear to be "affecting her mentally as far as decisions" and that the jurors would be provided with comfortable chairs to sit in. Additionally, the trial court found that Juror Little could be a fair and impartial juror in considering the possible punishments. Defendant has not established by convincing evidence that the trial court abused its discretion in not excusing Juror Little for cause.

Prospective Juror Graves stated that she was personally familiar with the District Attorney because he had gone to school with her daughters and that she had known him since he was in the sixth grade. She did not believe that her familiarity with him would affect her view of the case, but she "would trust him" because she knew his character and reputation. Juror Graves wrote on her questionnaire that she was unsure if she would be able to devote her full attention to this case because of her husband's health. She explained during voir dire that he was a diabetic and that he was still breaking in a new insulin pump that had not yet been properly regulated, which could lead to a potentially life-threatening situation if she were not there when he might have hypoglycemia during the night. She stated that she did not trust her husband to properly regulate his pump while she was sequestered and that she did not have any other family member nearby that would be able to check on him.

With regard to her opinion on the death penalty, Juror Graves wrote on her questionnaire that it "depends on the crime and the evidence." She also indicated that she agreed with the statement "Although I do not believe that the death penalty ever ought to be imposed, as long as the law provides for it, I could impose it if I believed it was warranted in a particular case, depending on the evidence, the law, and what I learned about Defendant." Juror Graves stated that she did "believe in the death penalty, but under certain circumstances" and agreed that she would fairly consider it among the sentencing options. Juror Graves stated that she had previously been on a jury in a

capital case in the 1980s. She recalled that the jury deliberated a long time because the evidence was largely circumstantial. She stated that she initially was in favor of imposing the death penalty, but the jury ultimately imposed a sentence of life without parole due to the circumstantial nature of the evidence. Juror Graves said that she had a tendency to faint at the sight of blood and that she might pass out if she viewed graphic photographs or video; however, she was able to glance at the photographs admitted in the prior trial and stated that she would try her best to view the video in this case. Juror Graves stated that she was "[p]robably" inclined to impose the death penalty for premeditated murder but that she "would have to weigh everything that's presented[.]" Although she wrote on her questionnaire that life with parole might be an appropriate punishment if Defendant had been rehabilitated, Ms. Graves stated during voir dire that she had "vacillated with it" and that ultimately she did not believe that life with parole was an appropriate punishment. However, Ms. Graves stated that she would fairly consider life with parole "[i]f that's the letter of the law." She agreed that her preference would be to impose the death penalty unless there was some lingering doubt about Defendant's guilt, but she agreed that she would fairly consider each of the sentencing options.

Defendant challenged Juror Graves for cause, citing her tendency to faint at the sight of blood, her inclination toward the death penalty, and her husband's health. The trial court found that Juror Graves' responses indicated that the prior capital jury on which she served "considered all options" before imposing a sentence of life without parole. The trial court found that Juror Graves was "qualified to serve" because "[s]he indicated she would fairly consider all sentencing options." Defendant has not established by convincing evidence that the trial court abused its discretion in not excusing Juror Graves for cause due to her views on the death penalty. We note that the trial court did not address the potential hardship related to Juror Graves' husband's health and the potentially life-threatening situation that could occur if she were to be sequestered for the length of the trial. However, Defendant did not raise this as an error on appeal, potentially waiving the issue. *See* Tenn. R. App. P. 36(a). Moreover, even if the trial court abused its discretion in not excusing Juror Graves for this reason, any error is harmless unless Defendant can establish that the jury that actually heard his case was not fair and impartial. *See Howell*, 868 S.W.2d at 248.

### B. Potential Jurors Removed For Cause Over Defendant's Objection

Potential Juror Eads wrote on his questionnaire that he believed the death penalty was "fair for the crime" and that he would fairly consider all three forms of punishment. Juror Eads acknowledged that he accidentally circled two responses to a question asking which statement best reflected his beliefs about the death penalty, one of which stated "I believe that the death penalty is the appropriate form of punishment in some murder cases. I could return a verdict of death if I believed it was warranted in a particular

case . . ." while the other stated "Although I do not believe that the death penalty ever ought to be imposed, as long as the law provides for it, I could impose it if I believed it was warranted in a particular case . . . ." Juror Eads clarified that he believed "that it never ought to be imposed." Juror Eads also stated that he was confused by the question that asked him to rate his willingness to impose the death penalty on a scale of 1 to 10. On his questionnaire, Juror Eads rated himself a 10, indicating a person who would always impose the death penalty, but upon questioning, Juror Eads stated "there is no zero on there" and that he would never impose the death penalty. Juror Eads said he was confused by the whole questionnaire.

In summarizing his beliefs, Juror Eads said, "I don't believe anybody should be put to death" unless they "killed several people." Juror Eads agreed with the prosecutor that he would not fairly consider the death penalty. In response to defense counsel's question, Juror Eads stated that he could consider the death penalty "[i]f the law informs me I am supposed to consider it," but then he immediately asked if he was being "forc[ed] . . . into it[.]" Juror Eads stated that he probably could not consider the death penalty in this case because Defendant did not kill multiple people on a "murderous outrage." Agreeing that he did not know the circumstances of this case, Juror Eads stated, "I guess I could" consider all three forms of punishment and agreed that he did not know what he would do about the sentence until he heard the evidence. In response to the trial court's attempt to clarify his position, Juror Eads stated, "I don't know which one to decide whether I'm for the death penalty or against it. . . . I'm confused over the whole thing." The State challenged Juror Eads for cause, stating that his responses were "all over the place." The trial court agreed and excused Juror Eads for cause over Defendant's objection.

Potential Juror Milhorn wrote on her questionnaire that she was "not sure about [the] death penalty or that [she] would want that decision. [I]t would be hard and depend on the case [and] proven facts." She also indicated that she could never impose a sentence of death. Upon questioning by the State, Juror Milhorn agreed that the death penalty could be the appropriate punishment under certain circumstances but that she could not impose it. Juror Milhorn stated that she could impose the death penalty if she had to, explaining that "you do things in life that you don't want to do sometimes because that is the right thing to do." However, given the other choices of life and life without parole, Juror Milhorn agreed that she would disregard the death penalty. In response to defense counsel's questions, Juror Milhorn stated that her preference would be life without parole but that she could consider the death penalty "if I had to and it was a situation where it was proved." In response to the trial court's questions, Juror Milhorn stated that "there [are] times, yes, that the death penalty is called for" and that she could consider it if the person acted "intentionally and was vicious . . . or would be a threat to someone else." The trial court ultimately granted the State's challenge for cause, finding that Juror Milhorn initially stated that she could not "impose the death penalty if there

were other options . . . [a]nd then she kind of went back and forth several times after that."

Potential Juror Sesti informed the parties that she had a potential hardship with being sequestered because her fifteen-year-old son would be at home alone while her husband was at work and that she did not have any friends or family that could help with transportation to and from school. She said that when she spoke to her husband after filling out the questionnaire, he told her "don't get sequestered." With regard to her views on the death penalty, Juror Sesti wrote on her questionnaire, "I guess it depends on the circumstances. I am not for it or against it" but that it "would be [her] last choice if other punishment was available." She also indicated that she agreed with the statement, "Although I do not believe that the death penalty ever ought to be imposed, as long as the law provides for it, I could impose it if I believed it was warranted in a particular case[.]" During voir dire, Juror Sesti explained, "I don't know that I could do the death penalty. I don't feel like I'm the judge[.]" She said that she did not know if she could put her name on a verdict form imposing the death penalty and she would "[p]robably not" fairly consider the death penalty based on her religious beliefs. In response to the trial court's questions, Juror Sesti kept reiterating that she did not know if she could impose the death penalty. She said that she would change her answer on the questionnaire to the statement that read "I believe that the death penalty is the appropriate form of punishment in some murder cases, but I could never return a verdict of death." She stated, "If I had to say one way or the other, I would probably say no, but I don't know." The State challenged Juror Sesti for cause, arguing that "she is either incapable or unwilling to give us an answer to any of these questions that allow us to truly judge her ability to be an appropriate juror in this case." The trial court excused her for cause, finding that it was "not certain she would be able to vote death penalty if it were warranted."

On appeal, Defendant argues that the trial court abused its discretion in excusing each of these jurors for cause. Defendant asserts that "[a]ny conscientious potential juror could be conflicted about what he would do when placed in this hypothetical situation" about imposing the death penalty. However, the supreme court has held that a juror may be excused for cause due to "inconclusive responses" that indicate "he either would not or could not follow the instructions of the trial court." *State v. Keen*, 926 S.W.2d 727, 740 (Tenn. 1994), *on reh'g* (July 8, 1996). Additionally, the supreme court has affirmed a trial court's finding that a potential juror's "personal reservations [with the death penalty] . . . could have prevented or substantially impaired the performance of her duties'" under similar circumstances where a potential juror gave "equivocal" responses and expressed a general "unwillingness" to judge another. *State v. Odom*, 336 S.W.3d 541, 558-59 (Tenn. 2011) (internal quotation omitted). Defendant has not established by convincing evidence that the trial court abused its discretion in excusing Jurors Eads, Milhorn, and Sesti for cause.

## C. *Juror Crum*

As stated above, any error on the part of the trial court in excusing or failing to excuse a potential juror for cause is harmless unless the jury who actually heard the case was not fair and impartial because an incompetent juror was forced upon Defendant. *See Howell*, 868 S.W.2d at 248. In this case, Defendant had exhausted his peremptory challenges before Juror Crum was seated on the panel and subjected to individual voir dire. We note that the questionnaires of the jurors who were ultimately selected to try this case, including Juror Crum's, were not included in the record on appeal. However, according to the transcript of the individual voir dire, Juror Crum wrote on her questionnaire, "I am in favor of the death penalty if no doubt of crime committed." She clarified that she would want to have "[a]bsolute [sic] no doubt" because she "would not want to put an innocent person to death." Juror Crum agreed with the statement that she "believe[d] that the death penalty is the appropriate form of punishment in some murder cases and [she] could return a verdict of death if [she] believed it was warranted in a particular case[.]" Juror Crum stated that she was not open to considering life with parole for a premeditated murder conviction. After being told that life with parole meant that Defendant would serve a minimum of 51 years before release, Juror Crum said that she would consider it after hearing the evidence but that she was still "leaning more toward one way" and did "not agree with parole." Juror Crum explained that she believed that a sentence of life without parole would give a person a chance for "repentance" while still suffering a "consequence of what they did." While she did not want "to put some innocent person to death," she also did not want to take the chance that someone would be able to get "out and kill again." In response to the trial court's questions, Juror Crum stated that she would consider life with parole "but it would have to be very convincing evidence to not tell me that they didn't need to be without parole." She stated, "I would take a lot of notes and I would go back and look at them and prayerfully consider wisdom in a case that's going to affect someone's life." She agreed that she would consider each of the sentencing options "evenly" and "fairly" but that she would "lean towards the other two."

Defendant challenged Juror Crum for cause, arguing that her responses indicated that "she would put [the] burden on the [D]efendant" to convince her to vote for a life sentence with the possibility of parole. The State responded that Juror Crum stated multiple times that she would consider all of the evidence and was willing to consider all three forms of punishment. The trial court agreed with the State and did not excuse Juror Crum for cause. Because Defendant had exhausted all of his peremptory challenges, Juror Crum sat on the jury that tried the case. On appeal, Defendant argues that the trial erred in failing to excuse Juror Crum for cause because her responses during voir dire indicated that she "was not seriously inclined to listen to the trial court's instructions regarding consideration of each of the three forms of punishment" and that "she would only favor life with parole if the [D]efendant was to repent." However, a fair reading of

Juror Crum's responses indicates that although she had a preference for a sentence of life without parole because it provides someone a "second chance" without risking the safety of society, she would carefully consider all of the evidence presented and would fairly consider all three sentencing options. We note that in the transcript, the prosecutor made reference to a physical gesture that Juror Crum made while giving her responses that would support this interpretation. As our supreme court has said, "An assessment of the juror's ability to adhere to her oath made by the trial court, based upon not only the answers to questions posed by counsel but also nonverbal responses, is owed deference." *Odom*, 336 S.W.3d at 559 (citing *Uttecht*, 551 U.S. at 9). The trial court clearly did not get a "definite impression" from Juror Crum's responses that she could not follow the law. *See Hutchison*, 898 S.W.2d at 167.

Also, as a result of the jury's imposition of death as to both convictions for murder, any risk of unfairness to Defendant from Juror Crum sitting as a juror was essentially removed. Her responses during voir dire indicated, according to Defendant, that she would never vote to impose a sentence of "life with parole." A portion of the trial court's jury instructions at the conclusion of the sentencing hearing is as follows:

> Now, I want to go over the verdicts in this matter, which you'll be asked to consider, okay?
>
> First is life imprisonment. If you do not unanimously determine that a statutory aggravating circumstance has been proven by the State beyond a reasonable doubt, then the sentence shall be life imprisonment.
>
> You will write your verdict upon the enclosed form attached hereto and make a - - and made part of this charge.
>
> The verdict shall be, we, the jury, unanimously determine that no statutory aggravating circumstance has been proven by the State beyond a reasonable doubt. We, the jury, therefore, find that the sentence shall be imprisonment for life. The verdict must be unanimous and signed by each juror, okay? That's the verdict of life imprisonment.
>
> Next is life imprisonment without the possibility of parole, which would be the next possible verdict.
>
> If you unanimously determine that a statutory aggravating circumstance or circumstances have been proved by the State beyond a reasonable doubt, but that said statutory aggravating circumstance or circumstances have not been proven by the State to outweigh any mitigating circumstances beyond a reasonable doubt, you shall in your

considered discretion, sentence the Defendant either to imprisonment for life without possibly [sic] of parole or to imprisonment for life.

In choosing between the sentences of imprisonment of life without possibility of parole and imprisonment for life, you shall weigh and consider the statutory aggravating circumstance or circumstances proven by the State beyond a reasonable doubt and any mitigating circumstance or circumstances.

In your verdict, you shall reduce to writing the statutory aggravating circumstance or circumstances so found and shall return your verdict upon the enclosed form attached hereto and made a part of this charge.

The verdict should be as follows: We, the jury, unanimously find that the State has proven the following listed statutory aggravating circumstance or circumstances beyond a reasonable doubt.

We, the jury, unanimously find that any statutory aggravating circumstance or circumstances do not outweigh any mitigating circumstance or circumstances beyond a reasonable doubt. Therefore, you shall then indicate on the enclosed verdict form either - - either of these two: We, the jury, unanimously agree that the Defendant shall be sentenced to imprisonment of life without possibility of parole, or we, the jury, unanimously agree that the Defendant shall be sentenced to imprisonment for life. The verdict must be unanimous and signed by each juror.

And then third is the verdict of death. If you unanimously determine that at least one statutory aggravating circumstance or several aggravating statutory circumstances have been proven by the State beyond a reasonable doubt and said circumstances or circumstances have been proven by the State to outweigh any mitigating circumstances beyond a reasonable doubt, the sentence shall be death.

The jury shall reduce to writing the statutory aggravating circumstance or statutory aggravating circumstances so found and signify that the State has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances.

The jury was instructed that it *must* impose "life with parole" if it found no aggravating factor was proven beyond a reasonable doubt. If the jury found that at least one aggravating factor was proven beyond a reasonable doubt, but this did not outweigh mitigating factors beyond a reasonable doubt, *then* the jury must choose between life without possibility of parole and "life with parole." However, the jury found the existence of two aggravating factors for premeditated murder and two for felony murder (one of which is invalid by law – see below) *and* that the aggravating factor(s) outweighed the mitigating factors beyond a reasonable doubt. At that point, the jury was not permitted to even consider either life without the possibility of parole *or* life imprisonment (referred to by the parties as "life with parole"). The only sentence available was the death penalty.

Defendant has not established by convincing evidence that the trial court erred in failing to excuse Juror Crum for cause and, therefore, has not established that the jury that tried his case was not fair and impartial. Defendant is not entitled to relief on this issue.

### III. Video of Prior Aggravated Robbery

Prior to trial, Defendant filed a motion in limine to exclude a video recording depicting his prior aggravated robbery of a different convenience store. Instead, Defendant offered to stipulate that he had a prior conviction for aggravated robbery. The trial court denied the motion in limine, and the State played the video during the penalty phase. On appeal, Defendant argues that the similarities between the video of the prior robbery and the video of the instant offense combined to create a "shocking effect" that violated his right to a fair sentencing hearing. Defendant argues that the prejudice created by the video of the prior robbery outweighed any probative value it had, especially given that Defendant offered to concede the fact of his prior conviction and that the underlying facts could have been proven with other evidence. Defendant argues that the admission of the video "likely caused the jury to give undue weight to the aggravating factor regarding [Defendant's] prior crime of violence." Defendant asserts that "[t]he State's sole purpose for admitting the video was to inflame the passions of the jury and elicit feelings of contempt and horror towards the [Defendant]."

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002). A trial court abuses its discretion by applying an incorrect legal standard, reaching a decision that is illogical or unreasonable, or basing its decision on a clearly erroneous assessment of the evidence. *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). This standard of review "does not permit an appellate court to substitute its judgment for that of the trial court." *Id.* (citing *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018)).

The admissibility of evidence during a capital sentencing hearing is governed by Tennessee Code Annotated section 39-13-204(c), which states that "[a]ny such evidence that the court deems to have probative value on the issue of punishment may be received, regardless of its admissibility under the rules of evidence." As relevant to the issue herein, the statute further provides:

> In all cases where the state relies upon the aggravating factor that Defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of the evidence is outweighed by prejudice to either party.

*Id*.

"This statute expressly exempts evidence adduced in capital sentencing proceedings from the usual evidentiary rules." *State v. Odom*, 928 S.W.2d 18, 28 (Tenn. 1996). The Tennessee Supreme Court "has refrained, however, from holding that all evidence related to punishment is admissible without further inquiry." *State v. Sims*, 45 S.W.3d 1, 13 (Tenn. 2001). Instead, they have provided the following guidance:

> [I]n general, § 39-13-204(c) should be interpreted to allow trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissibility of evidence at a capital sentencing hearing. The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both Defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

*Id.* at 14. Under the statute, trial courts should "exclude any evidence that is repugnant to the constitutional guarantees of due process, or that would violate a defendant's right to confrontation or cross-examination." *State v. Berry*, 141 S.W.3d 549, 564 (Tenn. 2004).

After viewing the video, the trial court found that it was reliable, relevant to the prior violent felony aggravating circumstance, and admissible under Tennessee Code Annotated section 39-13-204(c). Defendant's sole argument on appeal is that the prejudicial effect of the video of the prior robbery outweighed any probative value given his offer to stipulate to the prior conviction. As an initial matter, we note that an offer to stipulate to the facts depicted in the video does not diminish its probative value under the sentencing statute the way it might under the rules of evidence during the guilt phase. *See Odom*, 336 S.W.3d at 566. Moreover, Tennessee Code Annotated section 39-13-204(c) specifically states that evidence concerning the facts and circumstances of a prior violent felony "shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of the evidence is outweighed by prejudice to either party." The Tennessee Supreme Court has previously upheld the admission of testimony from a victim of the prior violent felony, which may be very detailed. *See Young*, 196 S.W.3d at 114 n.9; *State v. Cole*, 155 S.W.3d 885, 906 (Tenn. 2005). Although Defendant argues that admission of the video of the prior robbery violated his right to a fair sentencing hearing and generally cites the federal and state constitutions, he does not make a specific argument as to how the admission of the video violated a specific constitutional right, such as the right to due process or the right to confront adverse witnesses. *See Berry*, 141 S.W.3d at 564. Defendant has not established that the trial court abused its discretion in admitting the video of Defendant's prior aggravated robbery during the capital sentencing phase.

### IV. Constitutionality of Death Penalty and Lethal Injection

Defendant argues that "the death penalty in general, and lethal injection in particular, violate the United States and Tennessee constitutions' prohibition on cruel and unusual punishment." Defendant acknowledges that both the United States and Tennessee Supreme Courts have rejected this argument. *See Baze v. Rees*, 553 U.S. 35, 47 (2008) (reaffirming that "capital punishment is constitutional" and upholding Kentucky's lethal injection protocol); *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 618 (Tenn. 2018) (rejecting Eighth Amendment challenge to the current three-drug lethal injection protocol); *Keen v. State*, 398 S.W.3d 594, 600 n.7 (Tenn. 2012) ("This Court has held, and repeatedly affirmed, that capital punishment itself does not violate the state and federal constitutions."). However, Defendant urges this Court to "reconsider earlier precedent." We decline to do so because "we, as an intermediate appellate court, are bound by the decisions of the Tennessee Supreme Court as to state and federal

constitutional questions, and the United States Supreme Court as the ultimate authority as to federal constitutional questions." *State v. Pendergrass*, 13 S.W.3d 389, 397 (Tenn. Crim. App. 1999).

## V. Mandatory Review

In this case, the jury imposed a death sentence for both the conviction for premeditated first degree murder and the conviction for felony murder. The trial court then merged the convictions into a single conviction and death sentence for premeditated first degree murder. On appeal, Defendant contends that his death sentence is disproportionate and that the aggravating factors found by the jury do not outweigh the mitigating factors beyond a reasonable doubt.

When reviewing a conviction for first degree murder and an accompanying sentence of death, this Court is required to review the record to determine whether the sentence of death was imposed in any arbitrary fashion; whether the evidence supports the jury's finding of the statutory aggravating circumstances; whether the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and Defendant. *See* T.C.A. § 39-13-206(c)(1).

### A. Whether the sentence of death was imposed in any arbitrary fashion

The death penalty is not imposed in an arbitrary fashion if Defendant's trial "was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure." *Young*, 196 S.W.3d at 115. A review of the record indicates that the trial court conducted the trial according to the laws and procedures of the State of Tennessee. The jury reached a unanimous verdict beyond a reasonable doubt that Defendant committed the crimes for which he was charged. Additionally, the jury reached a unanimous decision beyond a reasonable doubt that the aggravating circumstances outweighed any mitigating circumstances. Defendant's sentence of death was not imposed in an arbitrary fashion. *See* T.C.A. § 39-13-206(c)(1)(A).

### B. Whether the evidence supports the jury's finding of statutory aggravating circumstances

Under Tennessee Code Annotated section 39-13-206(c)(1)(B), this Court must independently determine whether the evidence in the record supports the jury's finding of the statutory aggravating circumstances. *See State v. Keen*, 31 S.W.3d 196, 205 (Tenn. 2000). This Court must view the evidence in a light most favorable to the State and determine whether a rational trier of fact could have found the existence of the

aggravating circumstances beyond a reasonable doubt. *State v. Rollins*, 188 S.W.3d 553, 571 (Tenn. 2006). In this case, the State presented two of the statutory aggravating factors under Tennessee Code Annotated section 39-13-204(i):

(2) Defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; [and] . . .

(7) The murder was knowingly committed, solicited, directed, or aided by Defendant, while Defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb[.]

The record supports the jury's finding that Defendant was previously convicted of a violent felony. *See* T.C.A. § 39-13-204(i)(2). The State admitted into evidence a certified judgment of Defendant's 2009 conviction for aggravated robbery in Madison County, as well as a written statement from Defendant admitting his role in that robbery. As discussed above, the State also admitted a video recording of that robbery, which showed Defendant and two other men entering a convenience store wielding guns. One of the men pointed his gun at the clerk. The Tennessee Supreme Court has held that the "use of a deadly weapon, such as pointing a gun at the victim, constitutes violence." *State v. McKinney*, 74 S.W.3d 291, 305-06 (Tenn. 2002). Defendant does not contest that his prior conviction for aggravated robbery constitutes a violent felony under the (i)(2) aggravating factor.

With regard to Defendant's conviction for premeditated first degree murder, the record also supports the jury's finding that the murder was committed while Defendant had a substantial role in attempting to commit a robbery. *See* T.C.A. § 39-13-204(i)(7). The killing of Mr. Dhalai occurred between Defendant's demand for money and his attempt to open the cash register. As to Defendant's conviction for felony murder however, we note that the Tennessee Supreme Court has held that this aggravating factor cannot be applied to a conviction for felony murder. *See State v. Middlebrooks*, 840 S.W.2d 317, 346 (Tenn. 1992); *but see State v. Howell*, 868 S.W.2d 238, 259 (Tenn. 1993) (holding that such error may be deemed harmless beyond a reasonable doubt). However, we need not determine whether the error is harmless beyond a reasonable doubt because Defendant's felony murder conviction and death sentence were merged into his conviction and death sentence for premeditated first degree murder, to which this aggravating circumstance was appropriately applied. If for some reason the premeditated

first degree murder is ever set aside, then this aggravating factor could not be applied to support a sentence of death for felony murder. Thus, it is necessary to vacate application of the aggravating factor in Tennessee Code Annotated section 39-13-204(i)(7) for the conviction of felony murder. As noted above, since it was merged, there is no need to determine at this time whether the error is harmless beyond a reasonable doubt.

*C. Whether the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances*

Under Tennessee Code Annotated section 39-13-206(c)(1)(C), this Court must independently determine whether the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. *See Keen*, 31 S.W.3d at 205. Again, this Court must view the evidence in the light most favorable to the State to determine whether "a rational trier of fact could have found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt." *Berry*, 141 S.W.3d at 570.

In this case, the trial court instructed the jury on the following mitigating factors:
1. There are choices other than [a] sentence of death.

2. Life without parole means that [Defendant] will never be released from prison.

3. If [Defendant] is sentenced to life without the possibility of parole, he will die in prison.

4. [Defendant] has a mother, two aunts, an uncle, a brother, a sister, and other close family members. [Defendant's] execution would have a devastating lifetime impact on all of these family members.

5. If [Defendant] is executed, his execution will no undue [sic] the harm suffered by Mr. Dhalai's family, but life without parole will provide [Defendant] the time to reflect on Mr. Dhalai's death for the rest of his life.

6. [Defendant] suffers from mental disorders due to circumstances beyond his control, including genetics, abuse, neglect, trauma, and other upbringing and environmental factors.

7. Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of Defendant's character or record or

any aspect of the circumstances of the offense favorable to Defendant, which is supported by the evidence.

During the penalty phase, Defendant presented the testimony of two experts who opined that Defendant suffered from low intelligence, cannabis use disorder, post-traumatic stress disorder, and antisocial personality disorder. In rebuttal, the State presented an expert witness who agreed that Defendant had antisocial personality disorder and cannabis use disorder but disagreed that he suffered from post-traumatic stress disorder. The State's expert described Defendant's IQ as low average, which she said was "typical for a criminal defendant or inmate." The experts agreed that Defendant had a disadvantaged childhood, including exposure to marijuana in the womb, poverty, an abusive stepfather, poor performance in school, and a family history of both substance abuse and criminal behavior. Defendant also suffered a trauma when he was shot in the back and again when he was held at gunpoint as a teenager. However, the experts disagreed about whether this caused Defendant to be emotionally numb and distant towards other people. The experts did agree on the fact that Defendant was capable of formulating and carrying out a plan to rob the Bull Market and that Defendant made a voluntary choice to kill Mr. Dhalai.

Moreover, this was not the first time that Defendant was involved in the armed robbery of a convenience store, as evidenced by his 2009 conviction for aggravated robbery committed under very similar circumstances. Defendant had only been out of prison for about six months at the time of this incident. Unlike in the prior robbery case where Defendant cooperated with the police by providing a voluntary statement, in this case Defendant responded with profanities and death threats when he was confronted by the police. Viewing this evidence in the light most favorable to the State, a rational trier of fact could have found that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

*D. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and Defendant*

Finally, this Court must conduct a comparative proportionality review under Tennessee Code Annotated section 39-13-206(c)(1)(D) in order to ensure that the death penalty is not imposed in an arbitrary and capricious manner. *Terry v. State*, 46 S.W.3d 147, 163 (Tenn. 2001). This Court does not function as a "super jury" to substitute our judgment for that of the sentencing jury. *State v. Godsey*, 60 S.W.3d 759, 782 (Tenn. 2001). Instead, we are to "apply a precedent-seeking method of comparative proportionality review" to determine whether Defendant's death sentence "'is disproportionate to the sentences imposed for similar crimes and similar defendants'" in order to "'identify and invalidate the aberrant death sentence.'" *State v. Thacker*, 164 S.W.3d 208, 232-33 (Tenn. 2005) (quoting *Bland*, 958 S.W.2d at 664).

The comparable cases for analysis are first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment with the possibility of parole, or death. *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006). This Court must examine "the facts and circumstances of the crime, the characteristics of Defendant, and the aggravating and mitigating circumstances involved." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002). In conducting this comparison with regard to the nature of the crime, we generally consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*State v. Rimmer*, 250 S.W.3d 12, 35 (Tenn. 2008); *see Rollins*, 188 S.W.3d at 575. We also compare the characteristics of Defendants, including their

> (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation.

*Rimmer*, 250 S.W.3d at 35; *Rollins*, 188 S.W.3d at 575. This case need not be identical to other cases in every respect, nor must we determine that this case is "more or less" like other death penalty cases. *See State v. Thomas*, 158 S.W.3d 361, 383 (Tenn. 2005). A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. *State v. Carruthers*, 35 S.W.3d 516, 569 (Tenn. 2000). Rather, "a death sentence is disproportionate if a case is 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.'" *State v. Davis*, 141 S.W.3d 600, 620 (Tenn. 2004) (quoting *Bland*, 958 S.W.2d at 668).

Defendant was twenty-six years old at the time of the instant offenses. He had one prior conviction for aggravated robbery. Although Defendant presented evidence of his mental condition and disadvantaged childhood, there was no indication that these impaired his judgment or ability to control his actions. Defendant shot the victim at the victim's place of employment during an attempted robbery. The victim did not provoke Defendant but simply did not comply with Defendant's demands. Defendant also fired a shot at Mr. Austin, causing Mr. Austin to fear for his life. Defendant did not offer assistance to the police, and the trial court found that he expressed no remorse throughout the trial.

We conclude that the death sentence in this case is not excessive or disproportionate when compared to the death penalty imposed in similar cases. The Tennessee Supreme Court has upheld the death penalty in cases where the victim was shot during the course of a robbery of the victim's place of employment and Defendant had at least one prior conviction for a violent felony. *See State v. Reid*, 91 S.W.3d 247, 287 (Tenn. 2002); *State v. Smith*, 993 S.W.2d 6, 18 (Tenn. 1999); *State v. Harries*, 657 S.W.2d 414 (Tenn. 1983). In *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993), the twenty-seven-year-old defendant murdered the clerk of a convenience store by shooting him in the head during the course of a robbery. As in this case, Defendant did not cooperate with the police, showed no remorse, and had previously been convicted of violent felonies, including another robbery. The defense presented mitigation proof related to Defendant's childhood environment and psychological testing. The Tennessee Supreme Court has also upheld the death penalty in cases involving defendants who presented evidence of mitigating circumstances substantially similar to that presented by Defendant in this case, including evidence of their backgrounds, poor childhood environments, parents who used drugs, and similar circumstances. *Odom*, 336 S.W.3d at 574; *Thomas*, 158 S.W.3d at 383; *Davis*, 141 S.W.3d at 621; *State v. Hines*, 919 S.W.2d 573 (Tenn. 1995). The penalty imposed by the jury in the present case is not disproportionate to the penalty imposed for similar crimes.

### *Conclusion*

Based on the foregoing, we affirm all the judgments except those for resisting arrest and felony murder. We note that the judgment for Count 8, resisting arrest, lists the incorrect conviction offense. Therefore, we remand the case to the trial court to correct the clerical error in the judgment for Count 8. Also, the trial court shall enter an amended judgment reflecting that the aggravating factor set forth in Tennessee Code Annotated section 39-13-204(i)(7) cannot be applied in the death sentence for the conviction of felony murder.

_____
THOMAS T. WOODALL, JUDGE